# WHEELING.

## Taylor, Sheriff v. LaFollette, Auditor.

### Decided June 13, 1901.

1. Sheriff's Payment—*Auditor—Sureties—Mandamus.*

    K. sheriff of M. County, on the 14th day of August, 1899, in the last year of the term of his office, being thereunto required by the said county court of said county executed a new bond as such sheriff. On the 18th day of January, 1900, certain moneys were paid by a railroad company to the auditor under section 67, chapter 29, Code, on account of taxes assessed against said company for the year 1899 for county purposes of M. County. K. in writing directed the auditor to apply said payments on account of said K.'s indebtedness to the State for taxes prior to July 1, 1899. Notice was given the auditor by the sureties of K. on his bond of August 14, 1899, not to so apply such payments. On the 8th day of February, 1900, said K. was removed from said office of sheriff for failure to give another bond as required, and on the day following, T., one of K.'s sureties on this bond of August 14, was appointed sheriff in the place of K. and gave bond and qualified as such sheriff. T. sued out a writ of *mandamus nisi* to require the auditor to account to him as such· sheriff under section 67, chapter 29, Code, for the taxes so paid in by the railroad company on the 18th day of January, 1900, notwithstanding K.'s special direction as to its application. *Held*, error to make the *mandamus* peremptory. (p. 481).

2. Auditor—*His Duties—Taxes—Sheriff.*

    Under the provisions of said section it is the duty of the auditor to account for and settle the taxes assessed for the last year of the term of office of a sheriff with the occupant of the office at the time such taxes were assessed. (p. 482).

3. RAILROAD—*Payment of Taxes Into Treasury.*

   In the case of taxes so assessed, and paid into the treasury by a railroad company for the last year of the term of office of a sheriff, where he has given a new bond covering such taxes, it would be the duty of the auditor, unless otherwise specially directed by the sheriff, to apply such payments to the taxes charged against said sheriff for the said year for which they were assessed. (p. 485).

Appeal from Circuit Court, Kanawha County.

Application of C. W. Taylor, sheriff, for writ of *mandamus* against L. M. La Follette, auditor. Writ granted, and defendant appeals.

*Reversed.*

BROWN, JACKSON & KNIGHT and FLOURNOY, PRICE & SMITH, for appellant.

CHILTON, MACCORKLE & CHILTON and DOUGLAS W. BROWN, for appellee.

McWHORTER, JUDGE:

N. J. Keadle was elected sheriff of Mingo County for the regular term of the office beginning January 1, 1897, gave bond and qualified and assumed the duties of said office and afterwards being thereto required by the county court of his county executed an additional bond under which bond said Keadle proceeded to receive and collect the tax, money, and levies of the year 1898, due the State and county, and thereby became legally indebted to the said county of Mingo and to the Auditor for the State, and the county court of said county deeming it proper to require still another new bond so notified said sheriff Keadle who executed a bond on the 14th day of August, 1899, with G. W. Taylor, J. E. Peck, Mary Taylor, S. J. Straten, and G. S. Buskirk as sureties, and on the same day said Keadle executed a bond for the school moneys that should thereafter come into his hands as such sheriff, with said G. W. Taylor, J. E. Peck, Mary Taylor, and others as sureties, on the 4th day of September, 1899, said Keadle as such sheriff entered into a written contract with J. E. Peck and G. W. Taylor (all the sureties of both of said bonds of August 14, 1899, being named in said contract as parties of the second part but signed only by Keadle, Peck and Taylor)

whereby it was agreed that "in consideration of the suretyship of the said parties of the second part." The said Peck and Taylor were to have control and management of the sheriffalty of said county for which said "Second parties would be liable on condition that said Keadle should perform certain duties of said office and receive certain fees and emoluments therefor as specified. In January 1900, notice was given by his sureties on the bonds of August 14 to said Keadle that on the 25th of January, 1900, they would move the county court of Mingo County to release them as such sureties. Keadle was granted until January 29, 1900, to obtain sureties on which day he having failed to furnish the required surety the county court made an order, releasing said sureties and demanding another bond and fixing the 8th day of February, 1900, when such bonds should be given, failing in which the court removed the said Keadle from the office of sheriff and on the 9th day of February the said court appointed said G. W. Taylor to fill the vacancy for the unexpired term of said sheriff, and the said Taylor executed bond as such sheriff which was duly approved and entered upon the duties of his said office. On the 18th day of January, 1900, the Norfolk & Western Railway Co. paid into the treasury of the State among other moneys six thousand three dollars and seventeen cents for county purposes of Mingo County and three hundred and twenty-five dollars and three cents for road purposes; and the Pullman Car Co. on the same date, in like manner paid in the sum of forty-six dollars and eighty-five cents for such county purposes and two dollars and twenty-one cents for road purposes, said moneys being for the taxes assessed for 1899 under section 67, chapter 29, Code. It appears that Keadle as such sheriff at the time of such payment of said moneys into the treasury was indebted to the State on account of taxes collected by him in former years in large sums for which he was in default. The appellant (Auditor) contends that it was his right and duty conferred and imposed by law upon him to apply said moneys to said indebtedness for which said sheriff was in default, and that Keadle by letter of date January 19th directed it so applied, that indeed with said letter were two orders covering the amounts, without date. But which Keadle afterwards dated January 24, 1900. That before making such application said auditor was notified by said Peck and Taylor not to so apply said moneys to the payment of Kea-

dle's old indebtedness for which he was in default, but that it should be applied to the taxes of 1899. Taylor as sheriff sued out of the circuit court of Kanawha County a *mandamus nisi,* requiring said auditor to account to said Taylor for said sums of money so paid into the treasury, by issuing his proper warrant and draft upon the treasury of the State for said sums in favor of said sheriff Taylor, or by making application thereof to the payment of any State taxes due by said Taylor, sheriff, or in such manner as said auditor and said Taylor might agree, or to show cause if any he could why he should not do so. Auditor La Follette by his counsel demurred to the petition and moved to quash the *mandamus nisi* which demurrer and motion were overruled, and the auditor filed his answer and return to the *mandamus nisi* and thereupon plaintiffs moved the court to award the peremptory *mandamus* prayed for notwithstanding the said answer and return thereto and the matter being considered by the court the *mandamus* was made peremptory and the auditor required to account to said Taylor, sheriff, for the said moneys so paid into the treasury by making proper warrants and drafts upon the treasury therefor in favor of said Taylor or by making application thereof as in the *mandamus nisi* stated, and it appearing to the court that the auditor in the matter in refusing to account to said Taylor was acting in good faith to find out with whom said accounting should be had and payment made, it was ordered that each party pay his own costs and no statute fee be recovered, said La Follette, auditor, applied for and procured a writ of error to said judgment assigning the following errors: "That the court erred first, in overruling said demurrer and motion to quash; it appearing, upon the face of said petition and the exhibits therewith filed, that the said relator Taylor had farmed of the said Keadle, sheriff, the office aforesaid, wherefore he was disqualified to become sheriff for the unexpired term, and was not entitled to receive said moneys in any event, or to maintain said proceedings as such sheriff, or otherwise; and further for want of parties: because said Keadle was a necessary party to the proceedings, wherein was to be determined the disposition of said moneys.

Also, in that said judgment required your petitioner to draw said warrants payable to said substituted sheriff or else credit said funds upon State taxes due from said substituted sheriff when, in fact, said taxes were received into the treasury during

the term, and paid to the credit of said Keadle, and before re-
moval from office.

Also, in that it denied to this respondent the right under the
law to apply the moneys so due said Keadle, to the indebtedness
due by him to the State.

Also, in that it denied to the said Keadle, the right to make
such application."

It is insisted that Taylor was by reason of the contract with
Keadle incapacitated under section 5, chapter 7, Code, for hold-
ing said office of sheriff. Does the question arise here? Would
Taylor as sheriff in any event be entitled to control this fund even
if eligible to the office? As far as his disqualification, by reason
of the illegal contract is concerned the statute applies as well
to Keadle as to Taylor, applies to both the buyer and the seller,
if the former is incapacitated thereby to take the office and exer-
cise its duties the latter is equally incapacitated to continue in
and perform its duties. These sums of money were paid into the
treasury while Keadle was yet sheriff and some three weeks be-
fore the appointment and qualification of Taylor. That they
should in all good consicence have been applied to the taxes of
1899 there can be no question and being paid to the auditor as
they were with his full knowledge of their source, he had no
authority under the law as a discretionary power or otherwise to
direct their application elsewhere than upon the taxes of 1899,
without such direction from sheriff Keadle. The auditor claims
that under section 67, chapter 29, Code, he has a right to apply
these payments to old indebtedness of the sheriff, his default of
former years. In *State* v. *Wade,* 15 W. Va. 524, at p. 535, JUDGE
GREEN in speaking of the discretion of the auditor in making ap-
plication of payments "so that it should go to the account, to
which the convienence of the State at the time required it to go,
and of which the auditor is always in a condition to judge" says
"this, I understand, was the discretion intended to be conferred
on the auditor; a discretion, the exercise of which could not
possibly injure any set of sureties. But to construe this statute
to authorize the auditor at his mere will and pleasure to apply a
sum of money, paid on the taxes of one year, to the taxes of other
years, so as to relieve one set of sureties from responsibility—
and attach responsibility—to another set, would be to convert a
statute, intended merely for the convenience of the State into a
statute which would enable the auditor to do gross injustice to

some sureties, and to confer great pecuniary favors on others according to his pleasure. The law cannot be so interpreted. If this were its meaning its constitutionality would be, to say the least doubtful. But it cannot be so interpreted. In the *Waid Case* just cited payment was made into the treasury on January 26, 1870, by the sheriff of nearly three-fourths of the taxes of 1869, directions to the auditor to apply it on the taxes of 1869, yet the auditor directed the whole of it applied upon the taxes of 1867 and 1868 for which the sheriff was delinquent claiming the right to do so, it was held that "the auditor was bound when directed at the time of payment, to apply the whole of the payment to the taxes of 1869." This language implies that in the absence of such direction from the sheriff at the time of payment, the auditor might have applied the payment as he attempted to do, to the defalcations of 1867 and 1868, which undoubtedly he could have done with a general payment made by the sheriff without direction as to its application unless when he (the auditor) received it he was aware that it was the proceeds of the taxes and levies of 1869, in wihch case the principles of equity and right would have required its application to the taxes of 1869. The appellee cites a part of sec. 681, Murphy on Official Bonds, to show that the money so paid cannot be so misappropriated, that taxes collected under a second bond applied to make good the default under a former bond of the same collector, but that section further says, "Although the law, when it falls to its lot to appropriate payments, will not suffer the revenues received under one term to be applied to a defalcation incurred under another term, yet if the officer himself makes the misappropriation, and the money is received in good faith by the proper officer, the misappropriation cannot be avoided, and is binding on the sureties." Appellee also cites sec. 637 *Id.* based on *Porter* v. *Stanley,* 47 Me. 515, where it is held that where the same person was collector in a town for several successive years and failed to pay over or account for a portion of the taxes committed to him the first year, moneys collected and paid over by him arising from the taxes committed in the subsequent years, cannot be appropriated to make up the deficiency of the first year so as to affect the relative rights and liabilities of the sureties on his several bonds, without their consent." And further, "A settlement made with him by the selectmen, in which such appropriations is at-

tempted to be made, is inequitable and unauthorized, and does not bind the town or the sureties."

In the opinion by Tenney, C. J., it is said, "This does not appear to have been done at the request of William Stanley, (the collector) or by his consent any further than if it was right that it should be done so he would consent thereto. A consent so qualified in a case of that kind was not consent as the condition, "if it was right" was not fulfilled. The authority which comes nearest to sustaining the position of appellee that even Keadle when making the payment could not by his direction apply the payments to his former indebtedness is the case of *U. S.* v. *January,* 7 Cranch. 572, and that is treating of the application of payments made of current collections on former indebtedness of the collector by the officer recovering the same, and not by the collector. And the case of *U. S.* v. *Eckford,* 1 Howard, 250, where, on page 251, the court says: "We think the rule established by this Court in the case of *U. S.* v. *January* and *Patterson,* 7 Cranch, 572, is the true one. In that case the court says: 'The debtor has the option if he thinks fit to exercise it and may direct the application of any particular payment at the time of making it. If he neglects to make the application, the creditor may make it; if he also neglects to apply the payment, the law will make the application.' But, the court adds, 'A majority of the court is of opinion that the rule adopted in ordinary cases is not applicable to the case where different sureties under distinct obligations are interested.' The treasury officers are the agents of the law. It regulates their duties, as it does the duties and rights of the collector and his sureties. The officers of the treasury cannot, by any exercise of their discretion, enlarge or restrict the obligations of the collector's bonds. Much less can they by the mere fact of keeping an account current, in which debits and credits are entered as they occur, and without any express appropriation of payments, affect the rights of sureties. The collector is a mere agent or trustee of the government. He holds the money he receives in trust, and is bound to pay it over to the government as the law requires. And in the faithful performance of this trust the sureties have a direct interest, and their rights cannot be disregarded. It is true, as argued, if the collector should misapply the public funds, his sureties are responsible, but this is not the question under consideration. The

collector does not misapply the funds in his hands, but pays them over to the government without any special direction as to their application.  Can the treasury officers say under such circumstances that the funds currently received and paid over shall be appropriated in discharge of a defalcation which occurred long before the sureties were bound for the collector, and by such appropriation hold the sureties liable for the amount? The statement of the case is the best refutation of the argument.  It is so unjust to the sureties, and so directly in conflict with the law and its policy that it requires but little consideration."  These cases only refer to the misapplication of such payments (and it is misapplication) by the receiving officers of the government, but recognized all the way through the collector's right to direct the application, however unjust it may be to the sureties.  In the case of *State* v. *Wade,* cited, the case of *Redfield* v. *Shaver,* 50 Me. 37, is cited in support of the collector's right to direct such payment while it is held that a collector of taxes when he paid the same into the treasury had a right to direct it to be applied to the taxes due from either of two years in which he had different sureties on his bond.  That Sheriff Keadle was so interested in the matter of this proceeding as to be a necessary party thereto, it manifestly so appears from the record.  *Cross* v. *Railroad Co.,* 34 W. Va. 742; *Armstrong* v. *County Court,* 15 W. Va. 190.  The question arises, can the appellee maintain this proceeding in his name as sheriff of Mingo County?  Section 67, chapter 29, Code, provides: "That the taxes assessed for the last year of term of office of the sheriff shall be paid to or settled with the sheriff who was in office at the time the assessment was made."  The taxes so paid into the treasury in this case were assessed in the last year of the term of Keadle in said office and were also paid in while he was yet sheriff, paid to the auditor under the statute, whose duty it was to account to said sheriff therefor, and as has been seen, the sheriff had the right to direct its application to his indebtedness, however, inequitable such application may be as affecting his sureties, and while without such direction on the part of Keadle it would have been the plain duty of the auditor having as was the fact full knowledge of the source of its payment and on what accounts to have applied the same to the taxes of 1899.

Such application as was made in this case may well be said

·to be a hard case, but as said by JUDGE HOLT, in *Cross* v. *R. R. Co.,* 34 W. Va., at page 747, "hard cases make bad law." When we undertake to correct particular wrongs or present great hardships in special cases which can only be done by the violation of long established and well settled principles, the particular wrong would better go uncorrected. The wrong that results from the misapplication of these payments at the direction of Keadle is only disclosed incidentally and is not really in issue. If the money should be in this proceeding directed to be paid to G. W. Taylor, as sheriff of Mingo County, it would go to relieve the said sheriff Taylor and his sureties on his official bond, and might not go to any extent to the relief of the sureties of Keadle on his last bond. The peremptory *mandamus* should not have bee nawarded and the judgment of the circuit court is reversed and the petition dismissed.

*Reversed.*

DENT, JUDGE, (*dissenting*) :

The essential facts in this case are as follows: N. J. Keadel was elected sheriff of Mingo County for the term beginning January 1, 1897, and gave bond as such with certain persons as sureties whose names are not revealed in the record.

On the — day of ———, 1898, by the requirements of the county court, he executed an additional bond with John Effler and Wm. M. Cox as his sureties.

. The county court having ascertained that Keadle was defaulting in the discharge of the duties of his office and that his sureties were insufficient, required him to execute a second additional bond, which he did on the 14th day of August, 1899, with J. E. Peck, G. W. Taylor, G. R. Buskirk, Mary Taylor, S. J. Stratton, M. E. Beavers, John A. Sheppard, M. H. Waldron, J. S. Miller, M. W. Hawley, Lucy E. Keadle, Wells Goodykoontz, W. A. Johnson, R. W. Peck and J. B. Buskirk as his sureties. These sureties being aware of Keadle's defalcation, before they would become his sureties required him to enter into an arrangement to appoint J. E. Peck and G. W. Taylor of their number his deputies, and permit them to arrange and control all financial matters so as to prevent any further defalcation on his part and preserve them harmless from loss thereby. The auditor and the county court both had notice of this arrangement and made no

objection thereto.   Under it these deputies proceeded to collect
and account to the State, county and district for the tax levies
of 1899.   Sheriff Keadle was in arrears to both county and State
for taxes, licenses and fines collected for the year 1898.

In January, 1900, the sureties on the last bond learning that
the sheriff in violation of his agreement was about to make an
effort to have the auditor to apply the tax levies for county pur-
poses on railroad corporation for the year 1899, paid to the
auditor for the county's benefit, on his defalcation to the State
for the year 1898, for the purpose of self-protection, notified the
auditor not to make such application and moved the county
court because thereof to relieve them from further liability on
the sheriff's bond.   The county court required Keadle to give a
new bond, and he failing to do so, on the 29th day of January,
1900, his office was declared vacant and George W. Taylor, one of
the sureties and a deputy was appointed to fill out the unexpired
term.   He therefore demanded that the auditor should pay over
or account to him for said railroad tax levies for county pur-
poses for the year 1899, amounting to six thousand three hundred
and ninety dollars and twenty-three cents.   This the auditor
refused to do for the reason that Keadle had given directions in
writing before his removal from office to apply these levies on
his defalcation for the year 1898, and while he had not yet done
so he believed he had the legal right to do so.

Thereupon these proceedings were instituted to test this ques-
tion and to determine promptly to whom these county funds now
in the hands of the auditor were legally payable.   The circuit
court determined that it was the duty of the auditor to pay or
account for these levies to the present sheriff as the treasurer of
and for the benefit of the county and that Keadle had no right
to direct or the auditor any right to apply these funds to the
sheriff's default for the year 1898, to the State, and now this
Court in its wisdom holds that the circuit court erred and that
Keadle had the right to misappropriate the county's levies for
county purposes for the year 1899, to pay his default to the
State for the year 1898, and that he is legally authorized to make
such appropriation.

The auditor is simply seeking to discharge his duty to the
State and has wisely left such misappropriation of the county's
funds to be made by this Court.

This makes such appropriation a legal application by the defaulting sheriff of funds held to be subject to his order and relieves his sureties on his last bond from any liability by reason thereof. His legal application of such funds could create no default for which sureties could be held liable, as such sheriff during the existence of their liability never had such funds in his possession nor under his control, but they were in the hands of the joint collecting agent of both the State and the county. If his direction to misapply this fund was legal, and the judgment of this Court makes it so, these sureties incur no liability for he is guilty of no default under his bond. It is true he has authorized the misappropriation of the county's funds to the payment of his indebtedness to the State, yet this Court holds that he had the right to do this for the reason that he was sheriff at the time the assessment was made and that he is chargeable with the funds not at the date of the receipt thereof, but at the date of the assessment which throws the liability wholly on his sureties at that time and not on those who subsequently because his sureties, and that after such assessment the county court could not remove him so as to prevent his making such application without regard to who was injured thereby. For if the county court could effect such result one day after the assessment was made they could do so at any time before the fund was paid over to him.

By this holding the liability for these funds is placed on the sureties getting the benefit thereof and they must account to the county therefor, and hence they gain nothing and are put in no better condition by this misapplication of the county's funds. Their liability remains the same and they have no interest in this controversy.

The last sureties being relieved from all liability by the holding of the court in sustaining the legality of the sheriff's misappropriation are no longer interested in this controversy.

But if it is an illegal misappropriation of the county's funds notwithstanding the court's decision, now *res adjudicata,* the sureties of the last bond have relieved themselves from all liability by doing far more than is required of them in notifying the proper authorities of such threatened illegal misappropriation in time for them to prevent the same and they cannot be made liable by a miscarriage of justice in a proceeding in this

Court to which they are not parties and by which they are not bound.

When the county authorities have notice of a wrong about to be committed to the county's detriment it becomes their duty to prevent such wrong for the protection of interested third parties not in a position to protect themselves and if they fail to do so the county and not such interested third party should bear the loss.

These last sureties not being liable whatever may be the final result of this suit and not necessary parties thereto, and the former sureties having a fixed liability which this suit cannot change are also unnecessary parties. If they could get the funds credited on their old liability they acquire a new liability equal in extent. Nor is Keadle a necessary party, for his liability continues regardless of the result of this litigation. His creditor may be changed from the State to the county, but not the amount of his indebtedness. He creates a new debt to pay an old one.

The question in this case narrows itself down between the county of Mingo, represented by its treasurer and collector, sheriff Taylor, on the one side, and the State represented by its auditor on the other side, as to whether the county or State shall be compelled to sue the sheriff and his sureties on the first two bonds, or they being admittedly insolvent, which shall bear the loss occasioned thereby, the taxpayers of the county or the taxpayers of the State?

It is argued that because the court failed to take a good bond the loss equitable should fall on the taxpayers of the county. This would make the taxpayers of the county all sureties of the sheriff, although the law nowhere so provides. The county court in taking the sheriff's bond acts as the agent of the State as well as of the county under laws made by the former, and which has not yet seen fit to enact a law making the taxpayers of each county responsible for the defaults of its sheriff. Before this is done the people must be consulted, unless it can be effected by judicial construction in violation of the constitutional inhibitions regardless of the fundamental principles of right and justice.

The funds in controversy belong to the county. They arise from levies made to meet the county's current expenses for the fiscal year beginning in 1899 and ending in 1900. The auditor

holds them as trustee for the county. There is no law other than the decision of this Court authorizing him to use them to pay a default of the sheriff of State moneys for the fiscal year, 1899, but if the sheriff as treasurer and collector of public moneys for State funds for 1899, to this extent the two funds may be set off against each other but not otherwise. In such case the sheriff would have State funds to substitute for the county funds in the hands of the auditor. A fair exchange would be no robbery.

But where the sheriff has no State funds in his hands but he is a defaulter to the State for a previous year, there is no law (except the decision of this Court) that will permit him to satisfy his default to the State by creating a like default to the county. He cannot spoil the few to satisfy the obligations of the 'many. Such was not the intention of the legislature in authorizing the auditor to make such arrangements with the sheriffs as may be most convenient.

To adopt the argument of JUDGE GREEN in the case of the *State* v. *Wade et al.*, 15 W. Va. 535, to this case we would say, "to construe this statute to authorize the Auditor at his mere will and pleasure by connivance with or direction of a defaulting sheriff to apply a sum of money paid on the taxes of one year for county purposes to the arrears of taxes of other years for State purposes, is to convert a statute intended merely for the convenience of the State into a statute which would enable the auditor to do gross injustice to the taxpayers of the county and confer great pecuniary benefit on the taxpayers of the State by shifting liability from the large resources of the latter to the limited resources of the former and thus render the burdens of taxation grossly unequal. A statute thus interpreted its constitutionality is undoubted. The just burdens of the taxpayers of the State ought not to be imposed on the taxpayers of a single county.

The legislature enacted no such law, but it becomes law by the misconstruction of this Court, and if persisted in, it can only be obviated by the legislature placing the liability where it justly belongs.

Admitting that this controversy is a question of liability between two sets of sureties the same conclusions must follow.

The last sureties, if liable for the taxes of 1899, have the

right to prevent their principal from misapplying them to his default for the year 1898 for which they are not liable. They do this by notifying the auditor not to make such misapplication even though authorized so to do by their principal. This relieves them from all liability if the auditor persists in making the misapplication. For as is said in Chapman and others against Commonwealth, 25 Grat. 748, "The auditor must of course act in good faith." *He cannot legally apply to the benefit of A. money he knows ought to be applied to B.* If a sheriff receive money for which his surety, B., is liable, he ought to apply it to the discharge of such liability and not to the discharge of the liability of A. on his account. Such a misappropriation would be a fraud on the rights of B, and if the auditor received the money with knowledge of the fraud he would be *particeps criminis.*" Such misapplication would be void and the parties legally entitled thereto to have the right to recover the money so misapplied.

The sureties on the last bond to avoid such liaiblity first protected themselves by an agreement as they had a perfect right to do, of which the auditor and county court both had notice.

Second, they notified the auditor not to make the threatened misapplication.

And third, they notified the county court and it became its duty to protect the sureties. This they undertook to do by removing the old and appointing a new sheriff who was authorized as its agent and treasurer to receive the money due the county in the hands of the auditor. He forthwith demanded the fund and on refusal of the auditor immediately began this proceeding, not in his own, but in the interest of the county to secure the funds due it.

If he had received the fund to which he was legally entitled he would receive it as treasurer of the county and his sureties would have become liable for the proper disbursement on the order of the county court. But not being able to secure, but being deprived of it by the decision of this Court, neither he nor his sureties became responsible for it in any manner. It is for the county's and not for his or his sureties' interests for him to receive it.

Had he failed to do or neglected his duty in this respect the county court could have held him and his sureties liable for his default. In taking these many steps to protect themselves the

sureties did far more than the law required of them, for it was the duty of the auditor having full knowledge of the source of the fund and being both the agent of the State and county with regard thereto, apply the same as the law directs, and if he fails to do so they cannot be held responsible for his malfeasance but are thereby relieved from all liability for the fund, especially when such illegal misapplication is sustained by this Court, for however erroneous such decision may be, it is law until abrogated by the legislature.

These sureties without taking any steps whatsoever had the right to rely on the auditor's legal application of the fund.

The law governing in such cases is plainly stated in the fifth point of the syllabus of *Chapman* v. *Commonwealth,* 25 Grat. 722, as follows: "If the debts be due by a collector or other receiver of public money under bonds with different sets of sureties, then the law will so apply the payment if possible as that the money collected under one bond shall be applied to the relief of the sureties in that bond. And the creditor in such a case, if he be informed as to the source from which the money with which a payment may have been made was derived, cannot apply it otherwise, even with the consent or by the directions of the principal debtor."

The provisions of the statute directing the auditor to account for and settle the taxes assessed for the last year of the term of office of a sheriff with the occupant of the office at the time such taxes were assessed, was not intended to apply to a defaulting sheriff nor enlarge his rights nor authorize him to change the rights of his sureties nor transfer his default from the State to the county, but it was to have each year's taxes preserved separately and applied properly to the year to which they belong. If Keadle had received the taxes levied for the State on persons and property within the county of Mingo for the year 1899 other than the railroad taxes then he is entitled to receive the railroad taxes for such year. As the record discloses, he, by agreement with his sureties, was to receive no taxes for the year 1899. They were to go into the hands of his sureties and now they must go into the hands of his successor who succeeded to all his unsettled business and who must account to the State for its share of the taxes for 1899. Taylor as sheriff might have held back from the auditor the State taxes for the year 1899, sufficient to cover

the county taxes for the same year withheld by the auditor, and thus compelled the auditor to sue him and his sureties on a final settlement and in such suit raised the questions here presented. The writ of *mandamus,* however, furnishes a more speedy, efficacious and just remedy to all the parties concerned and the right thereto is undoubtedly clear.

The sureties as heretofore shown are not interested in this controversy. Nor is Taylor or his sureties, for if he does not receive the money he is not chargeable therewith. Neither a sheriff nor his sureties are chargeable with the moneys collected by the auditor until they are actually paid over or accounted for in some way to such sheriff's credit or benefit being an obligation for which such sureties are liable. An auditor by paying a sheriff's back defaults though with his consent or direction cannot make his present sureties liable unless they were liable for such debts beforehand. An auditor without the consent of parties interested cannot change old or create new liabilities, nor can a principal without their consent increase the liability of his sureties.

This case plainly stated is this: The auditor has in his hands six thousand three hundred and ninety dollars and twenty-three cents funds belonging to the county of Mingo arising from the tax levies on railroad property for county purposes for the year 1899. The sheriff as treasurer and agent for the county in its name and for its benefit demands its application to the purposes for which the levies were made. This Court says no, the fund cannot be so applied because a defaulting sheriff whose place the plaintiff now holds has directed the auditor to misapply the same on his defalcation to the State for a previous year and thus transfer his default to the State for the year 1898, to the county in 1899, lifting the burden from the shoulders of the taxpayers of the State and placing it on the shoulders of the taxpayers of the county.

Such a perversion of law, justice, right and the taxing power has not, nor ever will receive the sanction of the legislature, nor will the taxpayers of the State at large become *particeps criminis* thereto by suffering the taxpayers of the little county of Mingo to bear this unjust burden imposed upon them by the inequitable judgment of this Court. If they permit injustice to grow though they sow not the seed, in the end they will reap its fruits more bitter than gall.